UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANDREA PETERSON                                              CIVIL ACTION

VERSUS                                                       NO. 13-0933-KDE-SS

WELLPOINT, INC., et al

REPORT AND RECOMMENDATION

On April 16, 2013, Andrea Peterson filed a complaint against the Center for Restorative Breast Surgery, LLC ("Center for Surgery") and others.[1] Ms. Peterson is proceeding in proper person. Rec. doc. 1. The District Judge referred the matter to the undersigned to file a report on any dispositive motions. Rec. doc. 7. All of the defendants filed motions to dismiss. Rec. doc. 55. It was recommended that all of the motions be granted except for the motion of the Center for Surgery. Id. at 13. It was recommended that its motion be granted as to all of Ms. Petersen's causes of action except her cause of action for breach of contract. Id. The District Judge adopted the report and recommendation. The only remaining claim is for breach of contact against the Center for Surgery. Rec. doc. 77.

The Center for Surgery filed a further motion to dismiss for lack of subject matter jurisdiction, or alternatively, for failure to state a claim for which relief can be granted. It contends that because Ms. Peterson has not complied with the administrative procedures provided for by the Louisiana Medical Malpractice Act ("MMA"), La. R.S. 40:1299.41, *et seq.*, her complaint must be dismissed without prejudice.

---

[1] The other defendants were Centers for Medicare & Medicaid Services, WellPoint, Inc., Empire HealthChoice Assurances, Inc., whose trade name is Empire BlueCross BlueShield, and Blue Cross and Blue Shield Association (Rec. doc. 32).

Ms. Peterson was given until May 26, 2014 to file an opposition. Rec. doc. 84. On May 6, 2014, she filed a motion to strike the motion to dismiss. Rec. doc. 85. It is treated as her opposition. Among her arguments is the contention that the motion to dismiss is untimely. "If the court determines <u>at any time</u> that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). The motion to dismiss is timely.

## MS. PETERSON'S CLAIM FOR BREACH OF CONTRACT[2]

Ms. Peterson's suit concerns her attempt to obtain breast reconstruction surgery in New Orleans. Dr. Scott Sullivan at the Center for Surgery is a micro vascular surgeon who specializes in complex breast reconstruction procedures.[3]

On Thursday, February 21, 2013, Ms. Peterson received a communication, dated February 5, 2013, from the Center for Surgery reporting that surgery was scheduled for Fairway Medical Surgical Hospital on Friday, March 1, 2013, at approximately 7:00 a.m. It asked that she arrive at the hospital for 5:30 a.m. A card indicated that she had a pre-op appointment with Dr. Sullivan on Wednesday, February 27, 2013, at 3:00 p.m., less than 48 hours before the scheduled surgery. Enclosed with the communication were instructions on medications to avoid before and after the surgery. Rec. doc. 4 (Exhibit E). On February 26, 2013, Ms. Peterson arrived in New Orleans from Atlanta. Para. 6.

On Wednesday, February 27, 2013, she arrived at the Center for Surgery for her pre-op appointment. Para. 7. She had not been examined by Dr. Sullivan before February 27, 2013. On February 27, 2013, Dr. Sullivan examined her and had her photographed. After the examination

---

[2] On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court accepts all well–pleaded facts as true, viewing them in the light most favorable to plaintiff. <u>In re Katrina Canal Breaches Litigation</u>, 495 F.3d 191, 205 (5th Cir. 2007).

[3] Affidavit of Andrea Peterson, dated April 11, 2013 at page 1, paragraph 4. Rec. doc. 4 (Attachment). Further references to the Affidavit are by paragraph number (para. ___).

and review of the photographs, he recommended a procedure different from the one described in the communications between Ms. Peterson and the Center for Surgery before the pre-op appointment. He reported that she must have a caregiver and remain in the area for one week following the surgery. Paras. 7-12. She then signed consent forms for surgery. Para. 17.

On the morning of Thursday, February 28, 2013, Ms. Peterson found a caregiver and arranged for lodging for the week following the surgery at Hope Lodge. Paras. 24 and 25.

At about noon on February 28, 2013, the Center for Surgery telephoned Ms. Peterson and notified her that the surgery was cancelled because she did not have a caregiver. Para. 26. At the Center for Surgery, she was given the February 28, 2013 letter from Dr. Sullivan in which he stated that he will not perform "any type of breast reconstruction surgery on you." Rec. doc. 19 (Exhibit). Even though she informed the Center for Surgery that she had arranged for a caregiver and lodging, the surgery was cancelled because she did not have a caregiver. Paras. 28 and 38.

In the following days, there were conversations between Ms. Peterson and representatives of the Center for Surgery. She also spoke to Dr. Sullivan. Paras. 26, 27, 28 and 38. On Saturday, March 16, 2013, Dr. Sullivan emailed Ms. Peterson. He reiterated his original decision that he would not be able to perform her surgery. He stated, "[b]ased on your circumstances, there are too many risk factors that could lead to post-operative complications." Rec. doc. 4 (Exhibit O).

Ms. Peterson contends that: (1) the Center for Surgery agreed to perform the surgery on Friday, March 1, 2013; (2) at the pre-op appointment on Wednesday, February 27, 2013, Dr. Sullivan told Ms. Peterson that in order to proceed with the surgery she was required to have a caregiver and lodging to remain in New Orleans for one week following the surgery; (3) on the

morning of Thursday, February 28, 2013, she arranged for the caregiver and the lodging; and (4) notwithstanding the fulfillment of these two conditions, the Center for Surgery and Dr. Sullivan refused to proceed with the surgery because she did not have a caregiver.

## **APPLICABLE LAW**

> State substantive laws apply in federal court, except where the Constitution, treaties or statutes of the United States otherwise require or provide. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

<u>Richardson v. Advanced Cardiovascular Systems, Inc</u>., 865 F.Supp. 1210, 1216 (E.D.La.,1994) (Schwartz, J.).

> "Malpractice" means any unintentional tort or <u>any breach of contract</u> based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely. . . .

La. R.S. 40:1299.41(A)(13)(emphasis added).

> All malpractice claims against health care providers covered by this Part, other than claims validly agreed for submission to a lawfully binding arbitration procedure, shall be reviewed by a medical review panel. . . .

La. R.S. 40:1299.47(A)(1)(a).

> No action against a health care provider covered by this Part, or his insurer, may be commenced in any court before the claimant's proposed complaint has been presented to a medical review panel established pursuant to this Section.

La.R.S. 40:1299.47(B)(1)(a)(i).

> [T]he coverage of the [Medical Malpractice] Act should be strictly construed. These limitations apply only in cases of liability for malpractice as defined in the Act. Any other liability of the health care provider to the patient is not subject to these limitations.

<u>Sewell v. Doctors Hospital</u>, 600 So.2d 577, 578 (La. 1992); and <u>Williamson v. Hospital Service Dist. No. 1 of Jefferson</u>, 888 So.2d 782, 786 (La. 2004). If Ms. Peterson's breach of contract

claim against the Center for Surgery is a malpractice claim, it is premature and must be dismissed. Bush v. Thoratec Corp., 2011 WL 5038842, *8 (E.D. La. 2011) (Fallon, J.).

In Coleman v. Deno, 813 So.2d 303 (La. 2002), the Louisiana Supreme Court identified six factors to be considered in determining whether conduct by a health care provider constitutes "malpractice" as defined by the Act.

> [1] whether the particular wrong is 'treatment related' or caused by a dereliction of professional skill;
>
> [2] whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached;
>
> [3] whether the pertinent act or omission involved assessment of the patient's condition;
>
> [4] whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform;
>
> [5] whether the injury would have occurred if the patient had not sought treatment; and
>
> [6] whether the tort alleged was intentional.

813 So.2d at 315-316. In Nash v. Brown, 898 So.2d 619 (La. App. 3rd Cir. 2005), the court described the issue as how much weight should be given each of these factors. Coleman, Williamson and Nash demonstrate how these factors are applied and weighed in particular cases.

In Coleman, the plaintiff went to JoEllen Smith Hospital with a complaint that he had pulled something in his chest. The emergency room physician ordered tests, which were negative. The plaintiff was discharged with medication and a prescription. More than 12 hours later, the plaintiff returned to JoEllen Smith Hospital and reported that his left armed was aching and swollen. A second emergency room physician noted a markedly elevated white blood count in laboratory results. The diagnosis was left arm cellulitis. Inpatient intravenous antibiotic treatment was required. The second ER physician determined that the plaintiff should be

transferred to Charity Hospital in New Orleans where there was a full-scale on-site laboratory capable of treating complicated infections. The plaintiff lacked insurance. The second ER physician arranged for the plaintiff's admission at Charity. The plaintiff, with his friend, provided his own transportation to Charity. He arrived at Charity about two and a half hours after his discharge from JoEllen Smith. There were further tests and x-rays at Charity. About seven hours after his arrival at Charity, intravenous antibiotic treatment was ordered. The next day, the plaintiff was examined by a Charity surgeon. Based on the surgeon's examination, the plaintiff was taken to surgery. Upon opening the arm, the surgeon found that the skin, fat and bulk of the muscles in the arm were dead and it was necessary to amputate the arm. An orthopedic surgeon confirmed the need for the amputation as a life saving measure.

      The plaintiff settled his claims against Charity and JoEllen Smith Hospital. He alleged that the two ER physicians at JoEllen Smith Hospital violated the federal anti-dumping provisions. Although the jury awarded the plaintiff $4.9 million, the trial judge applied the MMA to limit the award to $100,000. The court of appeal reversed and affirmed the jury's $4.9 million award.

      The Supreme Court described the issue as whether the evidence placed plaintiff's claim outside the scope of "malpractice" under the MMA. 813 So.2d at 314. The six factors were considered.

      As to the first factor (whether the particular wrong is 'treatment related' or caused by a dereliction of professional skill), the Supreme Court found that contrary to the plaintiff's suggestion that the decision to transfer him from JoEllen Smith Hospital to Charity could be divorced from the other treatment decisions made by the second ER physician, the decision as to

whether he should be treated at Charity or JoEllen Smith Hospital was part of his medical treatment. Id. at 317.

As to the second factor (whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached), the alleged wrongful conduct could not be evaluated based on common knowledge. Id.

As to the third factor (whether the pertinent act or omission involved assessment of the patient's condition), the decision to transfer was based on the plaintiff's condition. Id. at 318.

As to the fourth factor (whether an incident occurred in the context of a physician-patient relationship), the transfer decision occurred in the context of the relationship between the plaintiff and the second ER physician.

As to the fifth factor (whether the injury would have occurred if the patient had not sought treatment), the Supreme Court rejected the plaintiff's attempt to distance the transfer decision from the treatment received at JoEllen Smith Hospital. The plaintiff contended that the second ER physician failed to provide enough treatment. The Supreme Court responded that, "[c]ommon sense indicates that a claim based on failure to provide enough treatment is clearly linked to treatment." Id. at 318.

The final factor was whether the tort alleged by the plaintiff was intentional. It was not. It was not a case of obvious negligence where expert testimony would not be required. The Supreme Court held that plaintiff's claims were governed by the limitations of the MMA. Id. at 318.

In Williamson, the plaintiff was being pushed in a wheelchair at West Jefferson Medical Center by a hospital employee when the wheel fell off causing plaintiff to fall and injure herself.

7

The plaintiff alleged that West Jeff's employee negligently failed to repair the wheelchair and negligently failed to insure it was in proper working condition before returning it to service.

The Supreme Court found that the allegations concerning the hospital's negligence with the wheelchair were not treatment related. No "professional skill" was exercised in the repair of the wheelchair. 888 So.2d at 789-80. No expert medical evidence was required to determine the appropriate standard of care was breached. Id. at 790. The pertinent acts concerned the repair of the wheelchair. These acts or omissions did not implicate or require an assessment of the plaintiff's condition. Id. at 790. The repair and use of the wheelchair was not shown to be within the scope of activities a hospital must first be licensed to perform. Id. at 791.

As to the fifth factor (whether the injury would have occurred if the patient had not sought treatment), the Supreme Court found that:

> This factor initially weighs to some extent in favor of the defendant, because the plaintiff likely would not have been transported in the wheelchair had she not sought treatment at the hospital. Such reasoning, however, employs a "but for" rationale that may be overly facile. It is just as reasonable to say that any visitor to the hospital, even those not seeking treatment, who used this particular wheelchair could have suffered injury.

888 So.2d at 791. There was no allegation of an intentional tort. The Supreme Court concluded that that the plaintiff's claims did not fall within the provisions of the Medical Malpractice Act.

In Nash, the plaintiff alleged that his doctor's delay in performing administrative duties prevented the commencement of physical therapy by one month following a nerve graft procedure. This exacerbated his pre-existing condition. The court of appeal found that the plaintiff's claim was not subject to the MMA.

As to the first factor, the court of appeal concluded that the alleged wrong was not treatment related. It found that, based on the strict construction required for the Act, a line must be drawn between the professional and ministerial services rendered by health care providers.

8

898 So.2d at 623. The court described the plaintiff's claim as focused on the doctor's negligence in performing ministerial aspects of his practice. Because the claim concerned ministerial duties, expert medical evidence was not required. Id. Because the alleged claim occurred after the physician accurately assessed plaintiff's condition as requiring physical therapy, assessment of the plaintiff's condition was not at issue. Id. The physician-patient relationship was present. Id. at 623-624.

The court of appeal concluded that the fifth factor (whether the injury would have occurred if the patient had not sought treatment), weighed in favor of the application of the Act. There was no allegation that the ministerial claim was intentional. The court of appeal concluded:

> After examining all of the factors set forth by the supreme court, we find that they preponderate, especially due to the weight we give the first three factors under these particular facts, against applicability of the MMA. Because the conduct was not treatment related, does not require expert medical testimony, and did not involve assessment of the patient's condition, this case does not fall under the MMA. In summary we note that this case is simply not one that requires expert medical testimony for adjudication as a lay person is fully capable of determining whether defendants' delay in performing a secretarial function constitutes negligence.

898 So.2d 619 at 624.

## ANALYSIS

Coleman, Williamson and Nash are tort cases. The undersigned's research did not reveal a decision where the six factors were applied to a breach of contract claim. "Malpractice" can be an unintentional tort or breach of contract. La. R.S. 40:1299.41(A)(13). Any of the Coleman factors can apply to tort and contract claims. They will be applied to Ms. Peterson's claim.

The **first factor** is whether the particular wrong is 'treatment related' or caused by a dereliction of professional skill. The alleged breach of contract occurred after Dr. Sullivan

examined Ms. Peterson on Wednesday, February 27, 2013. Like Coleman, where the decision to transfer the plaintiff from JoEllen Smith Hospital to Charity could not be divorced from other treatment decisions made by the second ER physician, Dr. Sullivan's refusal to proceed with the surgery cannot be divorced from the treatment sought by Ms. Peterson; the performance of the breast reconstructive surgery.

The **second factor** is whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached. In Coleman, the alleged wrongful conduct by the second ER physician at JoEllen Smith Hospital could not be evaluated based on common knowledge. 813 So.2d at 317. In Williamson, however, no expert medical evidence was required to determine whether the appropriate standard of care was breached. 888 So.2d at 790. In Nash, the plaintiff's claim concerned ministerial aspects of the physician's practice. Expert medical evidence was not required. 898 So.2d at 623.

The decision to proceed or not proceed with Ms. Peterson's surgery was not a ministerial act. Dr. Sullivan emphasized that his decision had nothing to do with her payment status. Rec. doc. 4(Exhibit O). If Ms. Peterson's payment status was the reason for the decision, it would be characterized as a ministerial decision rather than a professional decision.

After the pre-op examination on February 27, 2013, Dr. Sullivan recommended a different procedure from the one described in the communications between Ms. Peterson and the Center for Surgery before the pre-op appointment. Ms. Peterson accepted the recommendation. Dr. Sullivan also reported that she must have a caregiver and remain in the area for one week following the surgery. On the morning of February 28, she arranged to be in New Orleans for one week following the surgery with a caregiver. On February 28, 2013, Dr. Sullivan wrote Ms. Peterson stating that he would not perform the surgery for four reasons which were related to the

need for a caregiver and to remain in the area post-surgery.[4] If the only issue was whether Ms. Peterson complied with these conditions, the claim for breach of contract could be evaluated with common knowledge as opposed to expert medical evidence.

After February 28, there were further communications between Ms. Peterson and the Center for Surgery. Ms. Peterson also spoke to Dr. Sullivan. On Saturday, March 16, Dr. Sullivan emailed Ms. Peterson and reported that,

> After further review and investigation, am writing to inform you that I stand by my original decision, and will not be able to perform your surgery. It has been my experience that a successful outcome from surgery depends on the totality of the patient's circumstances. Based on your circumstances, there are too many risk factors that could lead to post-operative complications.

Rec. doc. 4 (Exhibit O). On Sunday, March 17, Ms. Peterson replied. She contended that she had removed all risks that she was advised of since she arrived for her surgery that could cause post-operative complications. Id. Dr. Sullivan replied that, "[a]fter discussing this at length with my staff, I stand by my decision." Id.

The communications after February 28, 2013 demonstrate that there may have been more to Dr. Sullivan's decision to choose not to proceed with the surgery than simply the need to remain in New Orleans for one week following the surgery with a caregiver. Exactly what was revealed by Dr. Sullivan's "further review and investigation" to prompt his decision is not known. The determination of whether the results of this further review and investigation warranted Dr. Sullivan's decision cannot be resolved by common knowledge. It will be necessary to have expert medical evidence on whether, based on the totality of Ms. Peterson's

---

[4] The February 28, 2013 letter listed four reasons why Dr. Sullivan would not perform any type of breast reconstruction surgery on Ms. Peterson: (1) a caregiver is required for all surgical patients; (2) flap surgery patients must remain in the area for at least one week following surgery; (3) patients must have a caregiver with them during their post-surgery recovery phase; and (4) the hospital requires release of the patient to a caregiver. Rec. doc. 19 (Exhibit).

11

circumstances, the risks of post-operative complications were acceptable for proceeding with the breast reconstructive surgery.

The **third factor** is whether the pertinent act or omission involved an assessment of the patient's condition. After the pre-operative examination, Dr. Sullivan reported that he would not proceed with the surgery. Dr. Sullivan's refusal to proceed with the surgery involved his assessment of Ms. Peterson's condition which was made after his examination of her on February 27, 2013 and further communications with her. This is analogous to Coleman, where the decision to transfer to Charity was based on the plaintiff's condition. Id. at 318.

The **fourth factor** is whether an incident occurred in the context of a physician-patient relationship. The alleged breach of contract occurred after the pre-op examination. It occurred within the context of the physician-patient relationship. Ms. Peterson's claim that Dr. Sullivan was required by their contract to proceed with the surgery after the pre-op examination is somewhat analogous to the plaintiff's claim in Coleman that the second ER physician should have proceeded with intravenous antibiotic treatment at JoEllen Smith Hospital rather than transferring him to Charity.

The **fifth factor** is whether the injury would have occurred if the patient had not sought treatment. The alleged breach of contract would not have occurred if Ms. Peterson had not sought the surgery. This is more than an overly facile "but for" analysis. Williamson, 888 So.2d at 791. Unlike a wheelchair that was available at the hospital to persons who were not seeking treatment as well as patients at the hospital, Ms. Peterson's claim could only arise in a situation where a patient was seeking the breast reconstruction surgery. To paraphrase Coleman, common sense indicates that a claim for breach of contract based on failure to proceed with surgery is clearly linked to treatment. 813 So.2d at 318.

The **sixth factor**, an intentional breach of contract, is dependent on Dr. Sullivan's intent at the time, as discussed above with regard to factor two, and is unknown.

The six factors weigh in favor of application of the MMA to Ms. Peterson's claim. The key factor in the analysis is the second factor (whether the wrong requires expert medical evidence to determine whether there was a breach of contract). If the claim could be resolved with common knowledge, the weight of the factors would not preponderate in favor of application of the MMA. But that is not the case here. Thus, the claim is premature.

## RECOMMENDATION

IT IS RECOMMENDED that the Center for Surgery's motion to dismiss for lack of jurisdiction (Rec. doc. 81) be granted and the complaint be dismissed without prejudice.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within twenty-one (21) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 9th day of June, 2014.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**